FILED - GR
September 23, 2008 12:16 PM
RONALD C. WESTON, SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: __rmw____/_______

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**Joseph Alexander**,

Plaintiff,

v.

**NCO Financial Systems, Inc.,**
a Pennsylvania corporation,

Defendant.

**1:08-cv-892**

Hon. **Janet T. Neff**
**U.S. District Judge**

**Complaint**

## I. Introduction

1. This is an action for damages and declaratory relief, brought by a consumer against a debt collector in response to the debt collector's practices which violated the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.,* and the Michigan Collection Practices Act ("MCPA"), MCL § 339.901 *et seq*.

## II. Jurisdiction

2. This Court has jurisdiction under 15 U.S.C. § 1692k(d) (FDCPA), and 28 U.S.C. § 1331. This Court has supplemental jurisdiction regarding plaintiff's state law claims under 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. § 2201. Venue in this judicial district is proper because the pertinent events took place here.

## III. Parties

3. Plaintiff Joseph Alexander is an adult natural person residing in Osceola County, Michigan. Mr. Alexander is a "consumer" and "person" as the terms are defined and used in the

FDCPA. Mr. Alexander is a "consumer," "debtor" and "person" as the terms are defined and used in the MCPA.

4. Defendant NCO Financial Systems, Inc. ("NCO") is a Pennsylvania corporation doing business at 507 Prudential Road, Horsham, Pennsylvania 19044. NCO is qualified to do business in Michigan. The registered agent for NCO is The Corporation Company, 30600 Telegraph Road, Bingham Farms, Michigan 48025. NCO is a "debt collector" as the term is defined and used in the FDCPA. NCO is a "collection agency" and a "licensee" as the terms are defined and used in the MCPA.

**IV. Facts**

5. In or about March 2004, Mr. Alexander enrolled with Westwood College ("Westwood") (www.westwood.edu) and began to take online courses to earn a degree in communications. Westwood's representative told Mr. Alexander that it would cost less than $25,000.00 to obtain his degree. In order to finance his education, Mr. Alexander applied for one or more student loans. Mr. Alexander had a co-signer, Anne Holladay. Any resulting obligation to pay money in connection with the student loans was a "debt" as the term is defined and used in the FDCPA and MCPA.

6. Apparently, Mr. Alexander's student loan was financed through SLM Financial Corporation ("SLM")(Acct. # *****76420102).

7. Later in 2004, Mr. Alexander reviewed his student loan documents and discovered that the documents contained the wrong social security number and other errors. Mr. Alexander repeatedly telephoned Westwood and SLM and told them about the errors.

8. Later in 2004, Mr. Alexander received from Westwood and/or SLM, a new set of

loan documents. The documents contained various hand-written revisions and other modifications not agreed to by Mr. Alexander.

9. In December of 2004, Mr. Alexander repeatedly contacted Westwood in efforts to change his major from communications to criminal justice. However, Westwood failed to accommodate the request and otherwise refused Mr. Alexander's efforts to change his major. As a result, Mr. Alexander dropped Westwood and prepared to continue his education elsewhere.

10. In or about January of 2005, Mr. Alexander discovered that according to Westwood, Mr. Alexander already had incurred at least $25,000.00 of debt in connection with his Westwood online education.

11. Mr. Alexander repeatedly contacted Westwood and demanded an accounting. Westwood failed to provide information sufficient to justify the debt supposedly incurred by Mr. Alexander.

12. Mr. Alexander later determined that at least $6,000.00 of the supposed debt had been disbursed by SLM to Westwood approximately three months *after* Mr. Alexander was no longer enrolled at Westwood. When Mr. Alexander complained to SLM, he was instructed to contact Westwood and demand that the money be returned to SLM. Mr. Alexander complained to Westwood. It is unknown whether Westwood ever returned the unearned funds to SLM, or simply kept it.

13. Mr. Alexander later learned that there were other student loans in his name of which he had no knowledge, and which had been paid to Westwood. When Mr. Alexander investigated, he was told by Westwood and/or SLM that he supposedly had applied for and received the loans online. Mr. Alexander demanded and received the related paperwork, and

discovered that his signature had been forged to the documents.

14. The statements sent by SLM to Mr. Alexander were inconsistent, contradictory, and disclosed supposed balances which differed wildly from month to month, ranging from as low as approximately $12,000.00 to as high as approximately $29,000.00.

15. In or about early 2006, Mr. Alexander continued to demand an accounting from Westwood, but was told that the school no longer maintained a file regarding Mr. Alexander.

16. Mr. Alexander has repeatedly and consistently disputed the debt with Westwood and with SLM.

17. In or about 2006, Mr. Alexander refused to make another payment on the debt until Westwood and/or SLM provided an accurate accounting, provided all of his paperwork, and explained the inconsistent documents, inconsistent balances, and apparent forgeries.

18. Westwood and/or SLM failed to provide the requested information. Instead, SLM hired various entities to try to collect the disputed debt from Mr. Alexander and his co-signer.

19. In 2007, a supposed collection attorney hired by SLM telephoned Mr. Alexander and his co-signer repeatedly, making various false statements in efforts to collect the disputed debt.

20. In 2007, Mr. Alexander's co-signer, tired of the unlawful harassment by SLM's agents, cut a deal with SLM, purportedly paid approximately $6,000.00, and was relieved of further obligation to pay the supposed balance of the disputed debt.

21. SLM continued to hire additional debt collectors to collect the disputed debt from Mr. Alexander.

22. By letter dated September 2, 2008, NCO wrote Mr. Alexander, stated that it had

been hired by SLM, and demanded payment of the disputed debt. The letter stated that derogatory information regarding the debt may already have been reported to the national credit bureaus and warned that Mr. Alexander's credit rating may be affected. The letter invited Mr. Alexander to telephone NCO to discuss the matter.

23. In September 2008, Mr. Alexander spoke by telephone with an unidentified female NCO employee. In the ensuing conversation, the NCO employee made the following false and improper statements:

a) She was looking right then at Mr. Alexander's credit report, derogatory information regarding the debt had been on Mr. Alexander's credit report since 2006, and that if Mr. Alexander did not pay the debt, derogatory information would remain on Mr. Alexander's credit report forever.

b) Even if Mr. Alexander were to send NCO a letter stating that he refused to pay the alleged debt, NCO would not cease calling and writing Mr. Alexander and instead would continue its collection efforts.

The NCO employee then transferred Mr. Alexander to a NCO "Supervisor."

24. In September 2008, Mr. Alexander spoke by telephone with a female NCO employee. The NCO employee stated that she was a "Supervisor." The NCO employee may have stated that her name was Christine, although the name was not clearly stated. In the ensuing conversation, the NCO employee made the following false and improper statements:

a) "At this point, you are saying you are refusing to pay on the account. I am going to proceed with litigation against you. You will be hearing from our attorneys."

b) An attorney fee of $3,350.00 was going to be added to the debt, calculated as

twenty percent of the sum of the alleged balance and an already added twenty percent collection fee.

c) Without Ms. Alexander appearing in court, NCO was going to garnish twenty-five of Mr. Alexander's income and twenty-five percent of the income of Mr. Alexander's co-signer.

d) If Mr. Alexander or his co-signer have any property, the property is going to be seized.

25. NCO and its employees knowingly and willfully violated the FDCPA and MCPA.

26. As an actual and proximate result of defendant's acts and omissions, plaintiff has suffered actual damages and injury, including but not limited to, financial loss, fear, stress, mental anguish, emotional stress, embarrassment, and suffering for which he should be compensated in an amount to be established by jury and at trial.

## V. Claims for Relief

### Count 1– Fair Debt Collection Practices Act

27. Plaintiff incorporates the foregoing paragraphs by reference.

28. Defendant has violated the FDCPA. Defendant's violations of the FDCPA include, but are not necessarily limited to, the following:

a) Defendant violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which was to harass, oppress and abuse plaintiff in connection with the collection of a debt;

b) Defendant violated 15 U.S.C. § 1692e by using false, deceptive and misleading representations and means in connection with the collection or attempted

collection of a debt;

c) Defendant violated 15 U.S.C. § 1692f by using unfair and unconscionable means to collect or attempt to collect a debt; and

d) Defendant violated 15 U.S.C. § 1692g.

**Wherefore,** plaintiff seeks judgment against defendant for:

a) Actual damages pursuant to 15 U.S.C. § 1692k(a)(1);

b) Statutory damages pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c) Costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3);

d) A declaration that defendants' practices violate the FDCPA; and

e) Such further relief as the court deems just and proper.

**Count 2 – Michigan Collection Practices Act**

29. Plaintiff incorporates the foregoing paragraphs by reference.

30. Defendant has violated the MCPA. Defendant's violations include, but are not necessarily limited to, the following:

a) Defendant violated M.C.L. § 339.915(e) by making an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt;

b) Defendant violated M.C.L. § 339.915(f) by misrepresenting in a communication with a debtor the following: (i) the legal status of a legal action being taken or threatened, (ii) the legal rights of a creditor or debtor, and (iii) that the nonpayment of a debt will result in the seizure, garnishment, attachment, or sale of the debtor's property; and

c) Defendant violated M.C.L. § 339.915(q) by failing to implement a procedure

designed to prevent a violation by an employee.

**Wherefore,** plaintiff seeks judgment against defendant for:

a) Actual damages pursuant to M.C.L. § 339.916(2);

b) Treble the actual damages pursuant to M.C.L. § 339.916(2);

c) Statutory damages pursuant to M.C.L. § 339.916(2); and

d) Reasonable attorney's fees and court costs pursuant to M.C.L. § 339.916(2).

**Demand for Trial by Jury**

Plaintiff demands trial by jury.

Dated: September 23, 2008

Phillip C. Rogers (P34356)
Attorney for Plaintiff
40 Pearl Street, N.W., Suite 336
Grand Rapids, Michigan 49503-3026
(616) 776-1176
ConsumerLawyer@aol.com